WHELCHEL v. LUCKY et al.

(*Circuit Court, N. D. Georgia.* February 1, 1890.)

1. HUSBAND AND WIFE—WIFE'S EQUITABLE ESTATE—BONA FIDE PURCHASERS.
    Where legal title by deed and official record is in the husband, the equitable interest of the wife will not prevail against a mortgage made by the husband, in the absence of notice to the mortgagee.
2. TAXATION—TAX-SALES.
    Where an execution has been issued against a tax collector and the sureties on his bond, and an affidavit of illegality filed by the tax collector under the statutes of Georgia, (Code, §§ 525, 3666,) has been accepted by the levying officer, a subsequent sale of the property of the surety, before judgment on the illegality, is invalid, and conveys no title.

(*Syllabus by the Court.*)

In Equity. Bill for injunction.
*S. C. Dunlap* and *W. S. Pickerell,* for complainant.
*B. H. Hill,* for respondents.

NEWMAN, J. This is a bill to enjoin further proceedings under an execution issued from this court on a judgment against Alexander S. Whelchel on the foreclosure of a mortgage, or, more properly, a deed made under sections 1969, 1970, and 1971 of the Code of Georgia, and treated as an equitable mortgage. The bill is by the wife of Alexander S. Whelchel, the defendant in execution, she claiming title to the land levied on, and asserting that it is not subject to the execution. She bases this claim

on two grounds. She says, first, that while the deed to the land in question was made to her husband, and the title by the records, at the time the deed to secure the loan was made to Lucky, was in her husband, that her money, given her by her father, paid for the land, and that the deed should have been made to her, as she always supposed it had been until after decree in this case was taken. She says, therefore, that she had the equitable title to the land, and that Lucky's agent who negotiated the loan to her husband had express notice of her claim of title before the loan was made, and while it was under consideration. The evidence, uncontradicted, established the fact that money given Mrs. Whelchel by her father paid for the land, and it is not denied that she thought the legal title in her. The real question on that branch of the case is, did Lucky, by his agent, have notice, as contended, of Mrs. Whelchel's equitable title? The agent of Lucky, Gregory, asserts positively that he had no such notice. He says that he talked to Mrs. Whelchel about the land, and told her that her husband was negotiating a loan on the place; that "she made no objection whatever to the loan, and made no claim to any interest in the land; she said nothing at all about having bought the place with her own money, and said nothing that would in any way put me on notice of any such thing." Mrs. Whelchel, on the other hand, testifies that two men she supposes now to have been Mr. Gregory and his companion, although she did not know them at the time, came to her house in the fall of 1885. She supposes they were the same men, because no other two men came there that would fit the description of Mr. Cox and Mr. Gregory. She supposed at the time that they were miners who came to look at the lands for mineral purposes. They asked her some questions about the place, which she answered as best she could. She told them that she was expecting some miners. They did not tell her whether they were miners or not. They asked her about the land, and whether there were any minerals on it, "and, in the course of the conversation, said something about the title. I told them that my father had given me the money to buy the place, and that it was all paid for, and was all right,—not a cent owing for it. They did not tell me that they were out there to loan money to my husband, nor did either of them say a word to me, or in my presence, about a loan, or anything to that end, or say one word to disabuse my mind that they were mining men,—that they came to look about the place for mining purposes; nor did they say anything that gave me the slightest hint that they were fixing to loan money to my husband on the place; nor did I know that he wanted to borrow any money, nor that he was embarrassed about money matters at all." The testimony of Alexander S. Whelchel, the husband, is that his wife had no knowledge of his making a deed to Lucky, and did not consent to it, but, by all the evidence, he was not present at the time of the principal conversations between Mrs. Whelchel and Mr. Gregory; so that the issue is really between Mr. Gregory and Mrs. Whelchel, as to his having been put on notice as to the fact that her money paid for the land. She does not claim that she gave Mr. Gregory any warning, or stated anything specifically

in the way of a notice. Gathering her intention from her testimony as given in this case, it would seem that all she was endeavoring to impress upon Mr. Gregory was that the title to the place was all right; that it was paid for, and unincumbered; and, in connection with that, that her father gave her the money to pay for the place. The testimony of Gregory is positive, certain, and specific. I do not think that it can be fairly said that this evidence establishes the fact which it was incumbent on the plaintiff to show, namely, that the agent of the lender had notice of Mrs. Whelchel's equitable interest in the land conveyed to Lucky as security for the loan. Besides this, it seems unreasonable that a good loan agent, as Gregory seems to have been, would have loaned the money of his client to Whelchel, after he had notice from the wife that her money had paid for the land taken as security. On this branch of the case, therefore, I think the plaintiff has failed to sustain the position taken in her bill.

In addition to the ground for relief that has just been discussed, she claims that she has the legal title to the land in controversy, by purchase at a sheriff's sale under an execution against her husband, in July, 1888. The execution under which the land was sold was issued against one Chamblee, an alleged defaulting tax collector of Hall county, and others, among them Alexander S. Whelchel, as sureties on his official bond. It is claimed by the defendant that the circumstances surrounding this sale shows such collusion and fraud on the part of the complainant's attorneys, and others connected with her, in bringing about this sale, and in misleading defendant's agent as to the fact that the sale would take place, as to prevent complainant claiming any title to be derived therefrom as against the defendant here, and there is considerable force in this contention. But another question is raised which it seems should control the matter. It appears in evidence that the tax collector, the principal defendant in the execution under which this land was sold, had filed with the sheriff an affidavit of illegality under the statutes of Georgia, in which he claimed, that as to certain of the taxes in the execution, (there were four of them,) there was no amount whatever due by him as tax collector for the years for which they were issued, and that as to certain others only the amount named in the illegality (being a less amount than that claimed in the execution) was due, and that the amount acknowledged to be due had been tendered to the officer authorized to receive it. These affidavits of illegality were received and accepted by the sheriff, and the question raised is as to whether or not the sheriff had authority to proceed any further with his execution until after the issue made by the illegalities had been properly determined in the court to which they were returnable. Section 525 of the Code of Georgia provides that "if such execution shall issue for too much, or if defendant denies on oath owing any part thereof, he may, by filing an affidavit of illegality, according to the rules governing other illegalities, cause an issue to be formed thereon, which shall be tried by a special jury, at the first term of the superior court thereafter." It will be seen that this refers to the "rules governing other illegalities." Section 3666 of the Code, on the subject

of illegality to executions, provides that, "when the levy shall have been made, and affidavit and bond delivered to the officer as herein provided, it shall be the duty of such officer to suspend further proceedings on such execution, and return the execution, affidavit and bond to the next term of the court from which the execution issued, and it shall be the duty of said court to determine thereon at the first term thereof," etc. Now, after the sheriff had accepted the affidavits of illegality offered by the tax collector, did he have any power or authority to proceed further with the execution, and to sell the property of the surety advertised under the executions? To state this proposition seems to be to determine it. If, after the tax collector has made issue, as provided by the statutes, that no amount, or only such amount as he tenders on the execution, is due, the sheriff can proceed to sell the property of the surety, it would lead to great hardship, interminable confusion, and difficulty. The tax collector alone can tender this affidavit of illegality, and his sureties must certainly become subrogated to such rights as he acquires when the illegality is accepted by the sheriff. Besides, the express language of the statute is that the officer shall "suspend further proceedings on said execution, and return it," etc. It seems clear that, after the acceptance of the affidavit of illegality, the execution ceases to have vitality as an instrument to bring property either of the principal or surety to sale. If it were otherwise, in the case of an execution wrongfully issued, and an affidavit of illegality filed by the tax collector, and accepted by the levying officer, and the illegality afterwards sustained by the judgment of the court to the effect that no amount whatever was due by the tax collector, the sureties in the mean time, if having the available property, could be made, by levy and sale, to pay the whole amount of the execution. The conclusion is irresistible that the act of the sheriff in selling this land after an acceptance of the illegality filed by the tax collector, and the deed made by him to Mrs. Whelchel in pursuance of that sale, were void, and that she acquired no title thereby. This disposes of the two grounds for relief made by the complainant, and a decree must be entered denying the injunction prayed for.